UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL T. KEOHAN,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              13-11446-MBB

NAPHCARE MEDICAL SERVICES,
FRANK G. COUSINS and
MICHAEL MARKS,
        Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT NAPHCARE, INC.'S MOTION FOR SUMMARY**
**JUDGMENT (DOCKET ENTRY # 54); DEFENDANTS FRANK G. COUSINS**
**AND MICHAEL MARKS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 51)**

**November 3, 2015**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by defendants Frank G. Cousins ("Cousins"), Sheriff of the
Essex County Sheriff's Department, and Michael Marks ("Marks"),
Superintendent of Essex County Correctional Facility ("ECCF") in
Middleton, Massachusetts, under Fed.R.Civ.P. 56 ("Rule 56").
(Docket Entry # 51).  Defendant NaphCare, Inc. ("NaphCare") also
moves for summary judgment under Rule 56.  (Docket Entry # 54).

PROCEDURAL BACKGROUND

Plaintiff Michael T. Keohan ("plaintiff"), an inmate at
ECCF, filed an amended complaint against Cousins, Marks and
NaphCare ("defendants") based on a denial of or inadequate

medical care in violation of the Eighth Amendment under 42
U.S.C. § 1983 ("section 1983").  (Docket Entry # 9, pp. 1, 2).
The amended complaint alleges that plaintiff fell in the shower
at ECCF on July 19, 2012, and hit his right elbow.  He also
complains that ECCF Correctional Officers V. Valano and James
Foley removed his knee brace.  (Docket Entry # 9, p. 3).
NaphCare refused to provide adequate medical care, including
authorizing physical therapy.

In seeking summary judgment, Cousins and Marks argue that
the undisputed facts do not give rise to a denial of medical
care under the Eighth Amendment.  Cousins and Marks further
maintain that any supervisory liability claim fails because, as
sheriff and superintendent, they lacked personal knowledge of
plaintiff's alleged fall in the shower.  (Docket Entry # 52, p.
5).

NaphCare argues that it is entitled to summary judgment
because there is no respondeat superior liability under section
1983.  (Docket Entry # 55, p. 5).  NaphCare also contends that
the facts fail to show that it acted with the necessary
deliberate indifference to plaintiff's serious medical needs.

STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine
whether trial is actually required.'"  <u>Tobin v. Federal Express</u>

2

Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014).

        "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).  The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file," id., "including depositions, documents, electronically stored information, affidavits or declarations." Fed.R.Civ.P. 56(c)(1).  "Unsupported allegations and speculation," however, "do not demonstrate either entitlement to

summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. Sheinkopf v. Stone, 927 F.2d 1259, 1262-63 (1st Cir. 1991). Plaintiff signed the amended complaint "under the pains and penalties of perjury." (Docket Entry # 9, p. 7). Accordingly, facts based on personal knowledge in the amended complaint are properly part of the summary judgment record. See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit International, Inc., 982 F.2d 686, 689-90 (1st Cir. 1993) (noting that pursuant to 28 U.S.C. § 1746 "an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment"); United States v. Gomez-Vigil, 929 F.2d 254, 258 (6th Cir. 1991) (28 U.S.C. § 1746 ''allows the use of 'unsworn declaration under penalty of perjury' in lieu of sworn oaths''); Uncle Henrys Inc. v. Plaut Consulting Inc., 240 F.Supp.2d 63, 69 (D.Me. 2003) (''[a]ffidavits need not be notarized to be cognizable on summary judgment so long as they are made under

penalties of perjury in accordance with 28 U.S.C. § 1746''). Conclusory allegations in the amended complaint, however, "do not pass muster, and hence, must be disregarded." Sheinkopf v. Stone, 927 F.2d at 1262.

Adhering to this framework, the record sets out the following facts for purposes of defendants' summary judgment motions.

FACTUAL BACKGROUND

Beginning in July 2012, plaintiff was an inmate residing at ECCF. (Docket Entry # 55-1, p. 3). Since 2008, NaphCare has been contracted by ECCF to provide comprehensive medical and health services to all inmates in its custody. (Docket Entry # 55-2). No employees of the Essex County Sheriff's Department directly provide medical care for inmates, as that was provided by ECCF's vendor, NaphCare. (Docket Entry # 53-3, p. 1).

Plaintiff is a 55 year old male who underwent multiple medical procedures prior to his incarceration. (Docket Entry # 55-1, pp. 50-53). In 2008, prior to his incarceration in ECCF, plaintiff was in a motorcycle accident and suffered "left forearm/wrist fractures," a "right wrist fracture," "fractured ribs," a "lacerated spleen [and] kidney" and various "fractures requiring facial reconstruction." (Docket Entry # 55-1, pp. 2, 50, 51). Additionally, in August 2011, plaintiff "underwent a right knee revision" and in April 2012 he underwent a right knee

anterior cruciate ligament ("ACL") reconstruction.  (Docket Entry # 55-1, p. 2).  Following the ACL surgery, plaintiff began physical therapy for his knee.  (Docket Entry # 55-1, pp. 10-11).  The Family Care Center in Stoneham, Massachusetts noted that plaintiff's recovery time may be longer than normal due to his multiple surgeries.  (Docket Entry # 55-1, pp. 10-11).

On May 12, 2012, plaintiff fell backward and hit his head, leading to an occipital skull fracture, subdural hematoma and nasal fracture.  (Docket Entry # 55-1, p. 10).  On May 15, 2012, plaintiff visited the emergency room at Massachusetts General Hospital ("MGH") complaining of a headache.  (Docket Entry # 55-1, p. 10).  Plaintiff stated he had not had oxycodone in a few weeks, however, hospital records reflect that he "used 20 oxycodone in 24 hours."  (Docket Entry # 55-1, p. 10).  Family Care Center records additionally noted on May 29, 2012, that plaintiff "[h]as had inappropriate behavior in our office and in Dr. [B]ickley's [sic] office regarding his need for narcotics," and that they are "not sure if there are any non-narcotic treatments that they can offer him."  (Docket Entry # 55-1, p. 11).

On May 30, 2012, Keith Fragoza, M.D. ("Dr. Fragoza") saw plaintiff at the MGH Center for Pain Medicine.  Upon examination, Dr. Fragoza noted that plaintiff's pain was most

likely an "inflammatory mechanism due to his prior mechanical injuries." (Docket Entry 55-1, pp. 7-8).

Two months later on July 11, 2012, plaintiff became incarcerated at ECCF due to a violation of his probation. (Docket Entry # 55-1, p. 3). Upon entering ECCF, plaintiff continued to wear the "knee immobilizer" from the right knee surgery. (Docket Entry # 55-1, p. 3). The immobilizer was described by staff as a "bledsoe brace" that was "hinged" and contained metal. (Docket Entry # 55-1, pp. 30, 32). During his medical intake interview at ECCF, Ann McDowell ("McDowell"), a registered nurse at ECCF, described that plaintiff as "very demanding" when requesting medication for his back and leg. (Docket Entry # 55-1. p. 30).

On July 19, 2012, plaintiff fell in the shower when his "right leg gave out." (Docket Entry # 9, pp. 2-3). When he fell, he hit his right elbow. (Docket Entry # 9, p. 3). The same day, plaintiff submitted a medical request form stating that he had "water on right elbow" that "may need to be drained." (Docket Entry # 55-1, p. 54). Plaintiff later indicated to the orthopedic clinic on November 21, 2012, that he had fallen five to six months prior and injured the right elbow. (Docket Entry # 55-1, p. 17). On July 26, 2012, plaintiff saw medical staff and complained of an infection on his right elbow. (Docket Entry # 55-1, p. 31). Melanie Goodlaxson

("Goodlaxson"), a registered nurse at ECCF, noted that plaintiff's elbow did appear to have fluid buildup and determined that plaintiff possibly had bursitis. (Docket Entry # 55-1, p. 31). Plaintiff was prescribed Motrin and an ace wrap. (Docket Entry # 55-1, p. 31). On July 27, 2012, Janice Hall ("Hall"), a nurse practitioner at ECCF, decided to taper plaintiff off of Neurontin as there were no signs of him having complained about neuropathic pain. (Docket Entry # 55-1, p. 31).

On August 6, 2012, plaintiff submitted five sick slips regarding his right elbow. (Docket Entry # 55-1, p. 31). Karen Barry ("Barry"), a registered nurse at ECCF, stated that plaintiff appeared extremely anxious and had stated with regards to his elbow that, "'If I take a razor blade to it, I guarantee PUS [sic] will come out.'" (Docket Entry # 55-1, p. 31). Barry arranged for plaintiff to see Hall the following day, August 7, 2012. (Docket Entry # 55-1, p. 31). Plaintiff told Hall he hit his elbow on the bunk and believes to have broken something inside. (Docket Entry # 55-1, p. 31). A radiology report of x-rays from that day concluded that plaintiff had "[o]steoarthritis in the right elbow," but no fracture or dislocation. (Docket Entry # 55-1, p. 12). Hall noted that plaintiff was not wearing the elbow sleeve that had been provided at his previous appointment. (Docket Entry # 55-1, p.

31).  Hall's notes for August 7, 2012, reflect the assessment
that plaintiff had bursitis in his right elbow.  Accordingly,
she prescribed Motrin and directed plaintiff to continue wearing
the elbow sleeve.  (Docket Entry # 55-1, p. 31).

An "inmate cell property liability form" dated September
11, 2012 lists plaintiff's knee brace.  Plaintiff signed the
form which also states that the brace was taken by Officer V.
Valano.  Officer James Foley, as shift commander, signed the
inmate cell property form.  (Docket Entry # 59, p. 5).
Plaintiff similarly attests that V. Valano and James Foley
removed plaintiff's knee brace.  (Docket Entry # 9, p. 3).

On October 3, 2012, plaintiff requested "some type of knee
support" and a cane because his metal knee brace broke.  (Docket
Entry # 55-1, pp. 3, 32).  Hall noted that plaintiff came to the
appointment wearing the support that was previously given for
his elbow on his knee.  (Docket Entry # 55-1, p. 32).  Plaintiff
also requested Neurontin for his facial pain.  On October 5,
2012, and in lieu of Neurontin, Hall prescribed plaintiff
Naprosyn and Elavil.  She also completed a special needs form to
obtain an elastic knee support and a cane for plaintiff.
(Docket Entry # 55-1, p. 32).  Hall's medical notes from October
5, 2012, reflect that staff "did not have documentation that a
hinged knee brace was still required" inasmuch as the knee
surgery was in April 2012.  (Docket Entry # 55-1, p. 32).

9

Also on October 5, 2012, an officer reported to medical staff that plaintiff was wearing the metal knee brace after the "officer took it away prior."  (Docket Entry # 55-1, p. 32). The officer also reported observing plaintiff leaving his cane in his cell while he ran laps in the gym.  (Docket Entry # 55-1, p. 32).

On November 16, 2012, Lawrence Churchville, M.D. ("Dr. Churchville") examined plaintiff.  His notes reflect that plaintiff had swelling in his left elbow and that his right knee appeared to be unstable.  (Docket Entry # 55-1, pp. 3, 16, 32). Dr. Churchville prescribed Gabapentin, an ace wrap and referred plaintiff for an orthopedics consultation for both his knee and elbow.  (Docket Entry # 55-1, pp. 3, 16, 32).  On November 21, 2012, an orthopedic physician examined plaintiff and administered a corticosteroid injection in his right elbow to alleviate the pain.  (Docket Entry # 55-1, pp. 3, 17, 33).  The physician also ordered an x-ray of the right knee.  The x-ray on November 29, 2012, showed degenerative changes in the right knee, but no acute fracture.  (Docket Entry # 55-1, pp. 3, 18).

On December 17, 2012, plaintiff saw medical staff complaining of right elbow, facial and knee pain.  (Docket Entry # 55-1, p. 33).  Dr. Churchville noted at this appointment that plaintiff was "visibly angry" upon entering the exam room, claiming that Dr. Churchville had told him that he did not have

a fracture of his elbow.  (Docket Entry # 55-1, p. 33).  Dr.
Churchville's notes show that plaintiff had a small remote
olecranon avulsion and that there is a request for plaintiff to
follow up with the orthopedic doctor.  (Docket Entry # 55-1, p.
33).  On December 19, 2012, plaintiff had a follow-up visit at
the orthopedic clinic.  The orthopedic physician observed that
plaintiff still lacked full extension in the elbow and
recommended a CAT scan and arthrogram as well as a follow-up
orthopedic appointment.  (Docket Entry # 55-1, pp. 3, 17).

On December 27 and 28, 2012, plaintiff was seen working
maintenance, lifting and assembling heavy steel bunk beds and
fully utilizing his right arm without signs of difficulty.
(Docket Entry # 55-1, pp. 4, 33).  On February 20, 2013,
plaintiff saw Cassandra Murray ("Murray"), a nurse practitioner
at ECCF.  She explained to plaintiff that the "MRI for" the
right elbow "was not approved" and that he required no further
orthopedic treatment.  (Docket Entry # 55-1, p. 19).  She also
noted that plaintiff was ambulating "very well" and without a
limp.  (Docket Entry # 55-1, p. 19).  Her treatment note states
that plaintiff "was seen carrying [the] steel bunk bed" on
December 28, 2012.  (Docket Entry # 55-1, p. 19).  Finally,
Murray discussed the possibility of medication with plaintiff,
however, he stated that he did not "want any."  (Docket Entry #
55-1, p. 20).

On April 2, 2013, plaintiff canceled a sick slip that he had placed to see medical staff regarding his elbow. (Docket Entry # 55-1, p. 33). Murray noted that the issue of plaintiff's elbow had been addressed "numerous times," that his off-site MRI request was not approved, and that he was currently on Naprosyn for his pain. (Docket Entry # 55-1, p. 33). She further stated that plaintiff "was observed lifting bunk beds." (Docket Entry # 55-1, p. 33).

On May 6, 2013, plaintiff fell and hit his head in the gymnasium. (Docket Entry # 55-1, p. 4, 34). Goodlaxson noted there was "no bruising, swelling or redness" and placed plaintiff in the infirmary overnight for "medical observation and further evaluation" in the morning. (Docket Entry # 55-1, p. 34).

The following day on May 7, 2013, Hall examined plaintiff. Her notes reflect there was no swelling in the right elbow. (Docket Entry # 55-1, pp. 34-35). She also described plaintiff as ambulating with a "steady gait" and that he had no "abrasions, ecchymosis, [or] erythema" on his forehead. (Docket Entry # 55-1, p. 34). Hall therefore determined that plaintiff was medically cleared from his head injury. (Docket Entry # 55-1, p. 34).

On May 28, 2013, plaintiff had a follow-up appointment with Dr. Churchville. At plaintiff's request, Dr. Churchville

stopped the Naprosyn and began plaintiff on Tylenol for the pain in his elbow and knee.  (Docket Entry # 55-1, pp. 20-21). During the appointment, plaintiff reported that the Velcro straps on his knee brace were ineffective and that he was upset when his knee brace was taken away.  (Docket Entry # 55-1, p. 20).  When Dr. Churchville asked plaintiff what he was unable to do as a result of his right elbow or right knee, plaintiff was unable to cite any specific thing but continued to indicate that he had a "high 'level of pain.'"  (Docket Entry # 55-1, pp. 4, 21).

Dr. Churchville noted that plaintiff had a normal gait. (Docket Entry # 55-1, p. 21).  The knee had a well-healed scar with some degenerative deformity.  (Docket Entry # 55-1, p. 21). Dr. Churchville additionally noted that plaintiff's right elbow had a "slight flexion deformity" but no swelling.  (Docket Entry # 55-1, p. 21).  He also noted there was an "indurated mobile nodule 6-7 mm medial to olecranon process" and that plaintiff retracted his arm "in severe pain to light palpation of nodule." (Docket Entry # 55-1, p. 21).  Plaintiff was provided an analgesic balm for his elbow and knee as needed.  (Docket Entry # 55-1, pp. 4, 21).  Additionally, Dr. Churchville filled out a special needs notification form authorizing a six inch ace bandage for plaintiff's right knee.  (Docket Entry # 55-1, p. 22).  Dr. Churchville ordered that x-rays be repeated at

13

plaintiff's request and that he have a follow-up appointment in two to three weeks. (Docket Entry # 55-1, p. 21). X-rays taken on May 30, 2013, indicated that plaintiff had "moderate osteoarthritis" in his right elbow and that there was an "old bone chip dorsal to the olecranon process." (Docket Entry # 55-1, p. 23).

On June 6, 2013, medical staff observed plaintiff carrying two cases of printer paper. (Docket Entry # 55-1, p. 36). On June 13, 2013, medical staff contacted plaintiff's "outside orthopedic doctor who indicated that" plaintiff had the right ACL revision on April 12, 2012, and only needed an ACL brace for the five weeks after the surgery. (Docket Entry # 55-1, pp. 4, 36). Hall stated that she will refer plaintiff again to the onsite orthopedic specialist as plaintiff is "continually reporting to medical staff that he needs a new knee brace or the present knee brace repaired." (Docket Entry # 55-1, p. 36).

On June 19, 2013, an orthopedic physician examined plaintiff at the orthopedic clinic. (Docket Entry # 55-1, pp. 4, 20). Clinic notes reflect that plaintiff came to the appointment with "a metal knee brace in poor repair" on his right knee, an elastic knee support underneath it, and a Velcro strap and a "thermal shirt" over the brace. (Docket Entry # 55-1, p. 24). The orthopedic specialist suggested repairing the brace and medical staff "will try to obtain more pieces of

Velcro to wrap around [the] brace to secure it." (Docket Entry
# 55-1, p. 24). The physician prescribed Feldene for pain and
instructed plaintiff to perform Theraband exercises to
strengthen his hamstring muscles. (Docket Entry # 55-1, pp. 4,
24). The orthopedic physician additionally noted that plaintiff
was "advised repeatedly" not to jog or run, as it was deemed
unsafe given his multiple ACL repairs. (Docket Entry # 55-1,
pp. 4, 24).

On July 3, 2013, plaintiff contacted the medical staff
stating that the Velcro straps for his knee brace did not
properly fit. (Docket Entry # 55-1, p. 36). Plaintiff
additionally expressed that he believed the hamstring exercises
that he was directed to perform were not correct as he had
previously used machines for his knee. (Docket Entry # 55-1, p.
36). Hall noted that upon walking into the appointment
plaintiff had "socks tied together and wrapped around" his knee
brace. (Docket Entry # 55-1, p. 36). Hall "properly secured"
the Velcro straps and reviewed it with plaintiff. (Docket Entry
# 55-1, p. 36). She also reinforced the hamstring exercises
prescribed by the orthopedic physician and plaintiff "agreed to
[the] plan." (Docket Entry # 55-1, p. 36).

On August 29, 2013, plaintiff had another follow-up
appointment with Dr. Churchville. (Docket Entry # 55-1, p. 36).
Dr. Churchville noted that plaintiff requested to be released to

work.  Dr. Churchville determined that plaintiff should continue
his current therapy and that he would inquire about plaintiff's
work status.  (Docket Entry # 55-1, p. 36).  On December 6,
2013, Dr. Churchville again evaluated plaintiff.  Plaintiff
reported that he felt "well," that his elbow and knee were
"helped with supports," and that he was working out in the
gymnasium.  (Docket Entry # 55-1, pp. 5, 37).  At this
appointment, Dr. Churchville discontinued plaintiff's
prescription for Feldene at his request.  (Docket Entry # 55-1,
p. 37).

     On April 17, 2014, plaintiff "pulled his right" lower leg
after he slipped while working.  (Docket Entry # 55-1, pp. 5,
37).  Yelena Yakirevich, a licensed practical nurse at ECCF,
described plaintiff's lower right leg as "visibly swollen."
Accordingly, she instructed plaintiff to rest with his right leg
elevated and that plaintiff be given ice, Tylenol and crutches.
(Docket Entry # 55-1, p. 37).  A special needs form was
completed giving plaintiff a lower bunk.  (Docket Entry # 55-1,
pp. 5, 29).  On April 30, 2014, plaintiff reported to medical
staff that at work he had helped move "heavy boulders."  (Docket
Entry # 55-1, pp. 5, 37).  Hall stated that as of June 2015,
plaintiff had "not requested medical care for his knee" in "over
a year" and was currently "on work release . . . working as a
roofer."  (Docket Entry # 55-1, p. 5).

DISCUSSION

Defendants seek summary judgment because:  (1) plaintiff fails to prove that defendants acted with deliberate indifference in violation of the Eighth Amendment; and (2) there is no respondeat superior liability under section 1983.  (Docket Entry ## 52, 55).

I.   Eighth Amendment Claim

In order to succeed in an Eighth Amendment claim based on denied or inadequate medical care, a prisoner must satisfy: "(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014), cert. denied, 135 S.Ct. 2059 (2015); See Leavitt v. Correctional Medical Services, Inc., 645 F.3d 484, 497 (1st Cir. 2011).

A medical need is objectively serious when it is "'diagnosed by a physician as mandating treatment, or . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995) (citing Gaudreault v. Municipality of Salem Mass., 923 F.2d 203, 208 (1st Cir. 1990)).  There must be a "substantial risk of serious harm" if the inmate "is not adequately treated."  Kosilek v. Maloney, 221 F.Supp.2d 156, 160 (D.Mass. 2002).  The standard for

17

adequate treatment "is based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations.  Courts must evaluate whether the care being provided is minimally adequate, but should defer to the considered judgment of prison officials in choosing between different forms of adequate medical care."  Soneeya v. Spencer, 851 F. Supp. 2d 228, 242 (D.Mass. 2012).

"Deliberate indifference means that 'a prison official subjectively ''must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'''"  Ruiz-Rosa v. Rullan, 485 F.3d at 156; accord Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Negligent care or "even malpractice does not give rise to a constitutional claim, rather, the treatment provided must have been so inadequate as 'to constitute "an unnecessary and wanton infliction of pain'' or to be ''repugnant to the conscience of mankind.'''''  Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497 (quoting Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)) (citation omitted); see also Kosilek v. Spencer, 774 F.3d at 87 n.9 (''medical imprudence-—without more-— is insufficient to establish an Eighth Amendment violation'').

A prison official is not deliberately indifferent if he responds ''reasonably to the risk.''  Burrell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002).  A disagreement about an appropriate course of treatment therefore does not amount to

deliberate indifference.  See Feeney v. Correctional Medical Services, Inc., 464 F.3d 158, 162 (1st Cir. 2006) (''when a plaintiff's 'allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation''') (internal brackets omitted).  Hence, courts consistently refuse '''to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.'''  Kosilek v. Spencer, 774 F.3d at 83 (quoting Watson v. Caton, 984 F.2d at 537, 540 (1st Cir. 1993), in parenthetical).  Conversely, deliberate indifference may exist '''by the denial of needed care as punishment and by decisions about medical care made recklessly with ''actual knowledge of impending harm, easily preventable.'''''  Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497 (quoting Ruiz-Rosa v. Rullan, 485 F.3d at 156).

A.  NaphCare

Plaintiff contends that NaphCare refused to provide him adequate medical care, including physical therapy, for his knee and elbow.  (Docket Entry # 9, p. 4).  He further submits that NaphCare denied him "follow-up care" (Docket Entry # 9, p. 4) and seeks a second opinion from a specialist at an outside hospital.  (Docket Entry # 60, p. 2).  He also contends that

19

medical staff improperly removed his knee brace thereby causing swelling and additional pain. (Docket Entry ## 9, 57). X-rays also showed swelling in his right elbow. (Docket Entry # 57).

NaphCare seeks summary judgment because the undisputed material facts demonstrate it was not deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment. (Docket Entry # 55). While plaintiff has the right to medical care while in state custody, he does not have the unencumbered right to the treatment of his choice. See Kosilek v. Spencer, 774 F.3d at 96.

Here, plaintiff did not have an objectively serious medical need with respect to his elbow and knee. He was observed multiple times by ECCF staff engaging in physical labor and fully utilizing the knee and elbow "without difficulty" (Docket Entry # 55-1, p. 33). See Gaudreault v. Municipality of Salem Mass., 923 F.2d at 208. Notwithstanding the prescribed Theraband exercises, lack of physical therapy does not provide a "substantial risk of serious harm." Kosilek v. Maloney, 221 F.Supp.2d at 160.

As to deliberate indifference, plaintiff oftentimes disagreed with NaphCare staff over the proper course of treatment for his knee and elbow injuries. The failure of NaphCare to provide additional care and therapy to plaintiff, however, does not rise to the level of deliberate indifference

particularly in light of the repeated and multiple examinations of plaintiff and adequate medical treatment he received.  See Feeney v. Correctional Medical Services, Inc., 464 F.3d at 162. Plaintiff's medical history was taken into consideration when formulating his course of treatment (Docket Entry # 55-1, pp. 4, 6-11, 36, 50-53) and NaphCare has shown through extensive documentation that it provided plaintiff with adequate care relative to the objective severity of plaintiff's complaints. See Soneeya v. Spencer, 851 F.Supp.2d at 242.  Throughout plaintiff's incarceration, NaphCare staff closely monitored his chronic pain and orthopedic conditions.  In fact, NaphCare continually provided plaintiff with medical care, including sending him to specialists and scheduling follow-up visits for his various ailments. (Docket Entry # 55-1, pp. 17, 21, 24, 32, 33).  Plaintiff's disagreements about the treatment plans do not give rise to a violation of his Eighth Amendment rights.  See id.  A disagreement or difference of opinion about whether to treat the elbow and knee injuries with prolonged use of support devices, MRI or physical therapy does not rise to the level of medical indifference.  See id.

While prisons are required to follow the law per the Eighth Amendment's standards, "The Constitution 'does not mandate comfortable prisons,'" and thus plaintiff is not guaranteed a preference of medical care, even when his views run contrary to

those of medical staff.  Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497 (quoting Farmer v. Brennan, 511 U.S. at 832).  Plaintiff had been seeking treatment for a history of chronic pain prior to his admission at ECCF.  (Docket Entry # 55-1, pp. 6, 7).  It is reasonable for medical staff to use their professional discretion to find suitable alternative methods of care, particularly given the extenuating factors of plaintiff's chronic pain.  See Kosilek v. Spencer, 774 F.3d at 90.  Overall, the actions of NaphCare and its medical staff show that they were not deliberately indifferent in their care of plaintiff.  Burrell v. Hampshire County, 307 F.3d at 8 ("even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk").

Here, plaintiff complains of "no medical help" for his right elbow and that his knee "brace was removed causing swelling" as well as pain.  (Docket Entry # 57, p. 3).  The record, however, belies any assertion that plaintiff was given no medical help.  The existence and content of the detailed medical records on plaintiff's ongoing condition (Docket Entry # 55-1) establishes that neither NaphCare nor its staff was deliberately indifferent to any medical needs, let alone serious medical needs of plaintiff.  Plaintiff was seen by multiple medical professionals for the treatment of his injuries.  (Docket Entry # 57, pp. 3, 4).  He received x-rays of his right elbow on August 7, 2012, and

May 30, 2013.  (Docket Entry # 55-1, pp. 3-4, 12, 23).  He

additionally received an x-ray of his right knee on November 29,

2012.  (Docket Entry # 55-1, pp. 3, 18).  Plaintiff was treated

by Dr. Churchville five times during his incarceration on

November 16, 2012, December 17, 2012, May 28, 2013, August 29,

2013, and December 6, 2013.  (Docket Entry # 55-1, pp. 16, 20,

25, 28, 33).  Although plaintiff alleges inadequate medical care

and requests an appointment with a medical specialist at an

"outside hospital" (Docket Entry # 60, p. 2), he was treated by

the orthopedic clinic three times on November 21, 2012, December

12, 2012, and June 19, 2013.  (Docket Entry # 55-1, pp. 17, 24).

Furthermore, plaintiff was treated by a nurse practitioner more

than 11 times regarding his knee and elbow (Docket Entry # 55-1,

pp. 19, 30-32, 34-36) and also saw various registered nurses and

other medical staff regularly throughout 2012 and 2013.

Plaintiff was treated for his pain in the form of Naprosyn,

Elavil, Gabapentin, Tylenol, analgesic balm and corticosteroid

injections.  (Docket Entry # 55-1, pp. 15-17, 21, 32).  He was

also given ace wraps, a cane, elastic supports for both his elbow

and knee and replacement Velcro straps for his leg brace. (Docket

Entry # 55-1, pp. 16, 32, 36).  Moreover, he received

comprehensive care for his knee injuries (Docket Entry # 55-1,

pp. 18, 21-22, 24, 32-33, 36), including physical therapy in the

form of prescribed Theraband exercises.  (Docket Entry # 55-1,

pp. 24, 36).  Given the continual attention shown to these
medical needs by NaphCare, there was no deliberate indifference
by NaphCare medical staff.  <u>Leavitt v. Correctional Medical
Services, Inc.</u>, 645 F.3d at 497.

Plaintiff also alleges he received inadequate medical care
because his knee brace was taken away.  (Docket Entry # 9, p. 3).
No documentation put forth by NaphCare or plaintiff suggest that
any member of NaphCare staff was responsible for the removal of
his brace.  Rather, on or about September 11, 2012, Officer V.
Valano took the knee brace.  Plaintiff was seen with the brace,
however, less than one month later on October 5, 2012.  (Docket
Entry # 55-1, p. 32) (Docket Entry # 59, p.p. 4-5).  Even if
NaphCare was involved in taking the knee brace on September 11,
2012, the knee brace was returned on October 5, 2012.  (Docket
Entry 59, pp. 1, 4).  On the same date, Hall evaluated plaintiff
and completed a special needs form to procure plaintiff an
elastic knee support as well as two "ace wraps" and a cane.
(Docket Entry # 55-1, pp. 3, 14).  She also provided or
prescribed Naprosyn PM and Elavil for plaintiff.  Such conduct
belies any deliberate indifference to plaintiff's medical needs,
including his need for a knee brace.[1]

---

[1]   Similar reasons establish that neither Marks nor Cousins
denied or provided inadequate medical care to plaintiff in
violation of the Eighth Amendment, as argued by Marks and
Cousins.  (Docket Entry # 52, p. 5).

Plaintiff next contends that his x-rays showed "fracture [and] chips" and that a "doctor said a mistake was made in read[ing] ex-ray [sic] results." (Docket Entry # 57, pp. 3, 4). Plaintiff's residual injuries from trauma pre-incarceration are visible on imaging taken during his stay at ECCF (Docket Entry # 55-1, p. 23) and also noted in his medical record prior to his incarceration at ECCF. (Docket Entry # 55-1, pp. 50-51). X-rays taken during plaintiff's incarceration at ECCF did not show any new fractures or any indication that there was an error in reading the x-rays. (Docket Entry # 55-1). Even if medical staff did make an error in reading plaintiff's x-rays, such actions amount to negligence, at most, and do not constitute deliberate indifference in violation of plaintiff's Eighth Amendment rights. Indeed, plaintiff received multiple visits with medical staff, x-rays, medications and analgesics to address any elbow and knee pain throughout the relevant time period. See Estelle v. Gamble, 429 U.S. at 107. Moreover, NaphCare had no obligation under the Eighth Amendment to provide plaintiff with the MRIs he requested for either of his injuries. Id.; Feeney v. Correctional Medical Services, Inc., 464 F.3d at 162.

In sum, plaintiff fails to show that NaphCare staff was deliberately indifferent to his serious medical needs or that the care it provided was inadequate, particularly in light of

the documented frequency and quality of care during his incarceration at ECCF.  Plaintiff has not put forth sufficient evidence to withstand summary judgment on the Eighth Amendment claim against NaphCare.[2]

B.   Cousins and Marks

Plaintiff maintains that he fell in the shower at ECCF causing injury to his elbow and that the fall was caused by Cousins and Marks' deliberate indifference.  Plaintiff further claims that taking the knee brace on September 11, 2012, violated the Eighth Amendment and that overall Marks and Cousins denied or provided inadequate medical care.  (Docket Entry # 9, pp. 2-4) (Docket Entry # 59, p. 5).

Cousins and Marks contend that plaintiff has not proven that either of them were deliberately indifferent to plaintiff's medical needs.  (Docket Entry # 52).  They also submit that, as supervisors, they lacked any direct involvement or knowledge of plaintiff's medical care.

Turning to the deliberate indifference argument and having set forth the applicable law, Cousins and Marks were not deliberately indifferent to the reasonable risk because they were unaware of the events.  Burrell v. Hampshire County, 307

---

[2]   Accordingly, it is not necessary to address NaphCare's alternative argument for summary judgment based upon respondeat superior.

F.3d at 8.   Nothing put forth by plaintiff counters the affidavits by Cousins and Marks stating that they were unaware of the alleged actions taken by ECCF officers with regards to both the alleged fall as well as the taking of plaintiff's knee brace.

Additionally, the facts do not constitute an Eighth Amendment complaint as there was no indication that Cousins' or Marks' actions produced an "unnecessary and wanton infliction of pain" on plaintiff.   Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497.   Plaintiff's knee brace was returned on October 5, 2012, less than a month after it was taken.   At the same time, Hall completed a form requesting the elastic knee support for plaintiff.   She also provided or prescribed plaintiff Elavil and Naprosyn PM on October 5, 2012.   Hall's notes also point out the lack of documentation for a hinged brace inasmuch as the knee surgery took place in April 2012.

Thus, during his incarceration, Hall provided plaintiff with a substitute for the knee brace in the form of the elastic knee support and ace wraps.   (Docket Entry # 55-1, p. 32).   X-rays of plaintiff's elbow did not show a fracture from the fall in the shower at ECCF on July 19, 2012.   (Docket Entry # 55-1, p. 12).   More to the point, neither Cousins nor Marks knew about the July 2012 fall or the September 2012 confiscation of the knee brace.

Cousins, the Sheriff of Essex County, and Marks, Superintendent of ECCF, also acted reasonably in response to the risk factors facing the ECCF population and the need for competent medical care.  See Burrell v. Hampshire County, 307 F.3d at 7.  NaphCare was an accredited company (Docket Entry # 55-2, p. 6) contracted specifically by Cousins (Docket Entry # 55-2, p. 15) to provide medical care at the facility for the time period in question.  There was a procedure in place that allowed inmates to request medical attention and receive appointments and appropriate care for their ailments.  (Docket Entry # 55-1, p. 4).  Plaintiff explicitly availed himself of the procedure on multiple occasions and the medical staff at ECCF responded appropriately.

As discussed with respect to the Eighth Amendment claim against NaphCare, plaintiff repeatedly saw medical personnel while at ECCF.  They treated both his elbow and his knee.  Such treatment included x-rays and multiple visits to an orthopedic physician.  Finally and in the alternative, plaintiff did not have a serious medical need for the knee brace.  Plaintiff's need for a knee brace ended five weeks after the April 2012 surgery, according to his orthopedic doctor.  (Docket Entry # 55-1, p. 36).  He did not enter ECCF until July 2012.

In sum, the undisputed material facts also showing that the injury was not the result of Cousins' or Marks' actions,

plaintiff is unable to demonstrate that Cousins or Marks violated his Eighth Amendment rights.

## II.   Respondeat Superior

In the alternative, Cousins and Marks maintain there is no affirmative link between their conduct and the subordinate ECCF officers.  Accordingly, because respondeat superior does not establish liability under section 1983, they submit they are entitled to summary judgment.

Supervisory liability is warranted under section 1983 where a supervisor is "'a primary violator or direct participant in the rights-violating incident,'" or where "'a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'"  Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009).  Overall, there must be "'an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization.'"  Id. "[P]roof of mere negligence, without more, is inadequate to ground supervisory liability."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).  A supervisor is not "'liable for the constitutional violations committed by his or her subordinates, unless there is an "affirmative link between the behavior of a subordinate and the action or inaction of his

29

supervisor such that the supervisor's conduct led inexorably to the constitutional violation."'" Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 533-534 (1st Cir. 2011) (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011), with internal ellipses omitted).  The supervisor's action or inaction must be affirmatively linked to the behavior of the subordinates "in the sense that it could be characterized as a supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Estate of Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir. 2008). Moreover, "'the plaintiff must show that the official had actual or constructive notice of the constitutional violation.'" Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d at 533-34 (quoting Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir. 2010)).  Therefore, unless Cousins and Marks actions are directly connected to that of the offending employees' they cannot be held liable for an Eighth Amendment violation.

As previously discussed, neither Cousins nor Marks had any knowledge of:  (1) any confiscation of plaintiff's knee brace by subordinates at ECCF; (2) any inadequate or denial of medical care to plaintiff by any subordinate staff member at ECCF; or (3) the July 19, 2012 fall in the shower caused by any subordinate at ECCF.  The necessary actual or constructive notice is therefore lacking.

With respect to the presence of an affirmative link, Cousins
and Marks are also not the primary violators or direct
participants in the incident that led to the fall in the shower
or the confiscation of plaintiff's knee brace and subsequent
medical treatment.  Indeed, plaintiff puts forth no evidence
showing that Cousins or Marks in any way authorized or encouraged
staff members to take any action with regards to plaintiff.  See
Sanchez v. Pereira-Castillo, 590 F.3d at 49.  Nor is there any
evidence sufficient to withstand summary judgment that Cousins
or Marks supervised, trained or hired subordinates with
deliberate indifference toward the possibility of their
providing deficient medical care to the ECCF inmate population
such as by confiscating required and necessary medical devices
for a serious medical need or condoning or encouraging medical
staff to overlook x-rays evidencing a serious medical need.

Thus, even if the officers took the knee brace or ECCF
staff ignored x-rays showing a fracture or excessive swelling
and such conduct rose to the level of an Eighth Amendment
violation, there is either no evidence or insufficient evidence
as to how that set of facts is affirmatively linked to the
actions of Cousins or Marks.  Accordingly, they are not liable
as supervisors.  See Sanchez v. Pereira-Castillo, 590 F.3d at
49.

31

In conclusion, the failure to establish any affirmative link between Cousins and Marks and the conduct of any subordinate at ECCF in denying or rendering inadequate medical care to plaintiff provides an alternative basis for summary judgment on the Eighth Amendment claim against them.  Likewise, there is no affirmative link between Cousins and Marks and the confiscation of plaintiff's knee brace and/or fall in the shower.  Finally, NaphCare as well as Cousins and Marks are entitled to summary judgment because of the absence of any deliberate indifference to plaintiff's serious medical needs within the meaning of the Eighth Amendment.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, NaphCare's motion for summary judgment (Docket Entry # 54) and Cousins and Marks motion for summary judgment (Docket Entry # 51) are **ALLOWED.**


__/s/ Marianne B. Bowler_____
**MARIANNE B. BOWLER**
United States Magistrate Judge